# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Robert L. Kroenlein Trust by and through Deborah Alden, Successor Trustee, and Chugwater Brewing Company, Inc., a Wyoming corporation,<br><br>              Plaintiffs,<br><br>vs.<br><br>Gary Bruce Kirchhefer, Commodore Bar, Inc., Rick L. Bowen, Silver Dollar Bar of Lusk, LLC, and Larry R. Halligan,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  11-CV-284-S |

---

### ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The above-captioned matter comes before the Court on Defendants Larry R. Halligan and the Silver Dollar Bar of Lusk [Doc. 76], the Commodore Bar, Inc. and Rick L. Bowen [Doc. 89] and Gary Bruce Kirchhefer's [Doc. 80] Motions for Summary Judgment.  The Court, having carefully reviewed the parties' submissions and being otherwise fully advised in the premises, finds and orders as follows:

### STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).   In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Spaulding v. United Transp.* Union, 279 F.3d 901, 904 (10th Cir. 2002).  A "material" fact is one that is "essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.* 144 F.3d 664, 670 (10th Cir. 1998).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*

The moving party has the initial burden to show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904. In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant is only required to show a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).  If a movant meets this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  In doing so, the nonmoving party may not rest upon its pleadings, but rather must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the non-movant." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th

Cir. 2000).  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams*, 233 F.3d at 1246.  Rule 56©(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.  Conclusory opinions, allegations unsupported by specific facts, or speculation will not satisfy this burden. *Id. See also, Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

As recognized by the court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, summary judgment is not a "disfavored procedural shortcut" to the contrary; it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Id.* In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  It is with these standards in mind that Defendants' motions for summary judgment are considered.

## Factual Background

On August 15, 2011, Plaintiffs filed their Complaint in this action.  The underlying facts giving rise to Plaintiffs' claims are straightforward.  The Robert L. Kroenlein Trust, initially and now through Chugwater Brewing Company, Inc., owns and operates J & B Liquors, a bar and liquor store in Torrington, Wyoming.  Until his death in November of 2004, Robert L. Kroenlein was the primary manager and operator.  Upon his death his

daughter, Deborah Alden, as the Successor Trustee was the primary person charged with operating J & B Liquors, but the overall operation and management was through her husband and the lawyer for Robert L. Kroenlein, Eric Alden.

As with any Wyoming liquor store, from time to time it would receive deliveries, typically twice a week, of particular brands of beer from the licensed distributor of that brand. (*See* Exhibit 2, Eric Alden Depo. at 11-16). This case arises out of a situation in which an employee and salesman Gary Bruce Kirchhefer (hereinafter "Kirchhefer") for the beer distributor (Orrison Distributing Ltd. or "Orrison") would order and charge J & B Liquors for excess products, primarily beer. (Doc 105, Kirchhefer Depo. at 43-44, 52-54). Kirchhefer would then turn around and give away or sell this product to other bars in his Orrison sales territory at a discount, pocketing the proceeds for his own.[1] Ultimately, in April 2008, Kirchhefer was fired from Orrison for his theft. In August of 2010, Kirchhefer was charged and pleaded guilty to a felony larceny by a bailee and three misdemeanor counts of larceny by bailee. (*See* Doc 105, Exhibit No. 7, Sworn Interview[2] of Gary Kirchhefer at 2-3). The two primary bars that Kirchhefer resold the beer he had

---

[1] Mr. Kirchhefer testified that a former, deceased truck driver for Orrison, Steve Richards, had acknowledged to him at one point that he had stolen some cases of beer from Orrison which he then sold to the Silver Dollar and Commodore. (Doc 105 at 33-34); *see also,* December 18, 2010, Sworn Interview of Gary Kirchhefer at 28, 35, 43-44 (attached to Defendant Bowen and Commodore Bar's Brief in Support of Motion for Summary Judgment). Kirchhefer also testified that he had heard in 2002-03 about a former employee of J & B Liquors that was allegedly allowing beer to be stolen out the back door of J & B Liquors. *Id.* at 63-64.

[2] On December 18, 2010, Kirchhefer gave a sworn interview under oath as part of his plea agreement under which the State of Wyoming could withdraw from the plea agreement if it found Kirchhefer made a material misstatement, omission of fact, withheld any material information within his knowledge, gave statements or information that was untruthful or failed to cooperate in any way. (See Doc. 106, Exhibit No. 7, 1-98).

stolen from J & B Liquors were the Commodore Bar, Inc., (hereinafter "Commodore") in Wheatland, Wyoming, owned by Rick Bowen, and the Silver Dollar Bar, Inc. (hereinafter "Silver Dollar"), owned by Larry R. Halligan, the additional Defendants herein.

According to Kirchhefer he began stealing beer from J & B Liquors in late 2005. (Doc 105 at 36-37). As the beer salesman, Kirchhefer would order (presale) the beer for J & B Liquors the day before it was delivered, making an electronic order via his computer to Orrison. *Id.* at 44-45. The following day a delivery truck driver for Orrison would off-load the beer in the alley next to the back door of J & B Liquors. *Id.* at 44. Kirchhefer would then arrive and dismiss the delivery driver and "kindly" take what J & B actually needed into the store coolers and put the excess beer, ordered and paid for by J & B, into his van. *Id.* at 45-46. Kirchhefer would then take the beer he had stolen from J & B Liquors and give it away to customers in exchange for keeping and ordering some of the less popular products, such as Tequiza or sell it. (Depo. at 47-48).

Kirchhefer testified that part of his rate of pay was dependent upon keeping "shelf space" with Orrison's brand of products. One of those products was Tequiza, but unlike Budweiser and Bud Light, it typically would not sell quickly and often times became dated. *Id.* at 48. To keep the shelf space for the Tequiza, Kirchhefer would give the bar owner a free case or two of beer (he had stolen from J & B Liquors) so long as they kept ordering a fresh case of Tequiza or other dated, unpopular product. *Id.* at 53-54. Kirchhefer then took the dated beer and usually gave it away, instead of sending it back

to Orrison's Cheyenne warehouse.[3] *Id.* at 48-49. There were also occasions that Kirchhefer would order extra slow selling brands of beer on J & B's order which he then stole and took to another bar to replace, at no cost, that bar's slow moving beer, keeping the dated beer to give away and the shelf space. *Id.* at 52-55. Kirchhefer would also "sell" the beer he had stolen from J&B Liquors to other bars, at a discount. In selling this stolen beer to other bars Kirchhefer would represent that he had a five percent breakage that allowed him to give them a better deal or discount on the beer:

> Q. So how did you explain selling it half price?
> A. I told them that the company was allowed a 5 percent breakage. We broke beer, and we were allowed so much for breakage and stuff like that. Stuff like that happened, but it wasn't broken.
> Q. So wouldn't you think if you told somebody we get so much for breakage, yet, it's obvious that it's not – I mean, not broken, shouldn't somebody know that you are basically telling them, look, I got room to steal, when you say we get 5 percent for breakage? You are basically saying I have got room to fudge on this deal, so I can give this to you.
> A. I just made it sound like I could give them a better deal.

(Kirchhefer Statement at 36-37). Two of the bars that got a "better deal" were the Commodore Bar and Silver Dollar Bar.

Part of Kirchhefer's three county sales territory included the Commodore bar in Wheatland, owned by Bowen and the Silver Dollar in Lusk, owned by Halligan. Around 2005 Kirchhefer began making presales to Halligan and approached him about purchasing discounted beer. Mr. Kirchhefer testified in his sworn statement, as to selling the stolen beer to Mr. Halligan:

---

[3] Kirchhefer testified that there were a couple of times he sold old or dated beer to Ron Elliott at the Commodore bar at a "discount" just to get rid of it. Kirchhefer Depo. at 67-68. This was prior to the times he sold discounted beer to Mr. Bowen.

Q. Do you remember approaching Larry?
A. No, not really.
Q. But, he had been doing the dealing, too?
A. Yeah, but I know pretty much what I said, I think.
Q. You suggested, I am sure, that you could sell him some beer at an attractive price.
A. Yeah, I told him. He had not idea it was stolen beer.
Q. He didn't know it was stolen from another customer?
A. Yeah, yes.
Q. Thought it was beer that –
A. That was the 5 percent in in the market that was owned by Orrison Distributing that I was calling breakage.
Q. You were essentially kind of fudging the books with your employer, again.
A. Yeah, that's what the assumption was to him, yes. It's not what was happening.
Q. So you told him this, and you told him I can get you this stuff for 12 bucks a case.
A. Hmm-mm.
Q. And he says he would be interested in that.
A. Yeah.

(*Id.* at 50-51). Mr. Halligan testified that Kirchhefer approached him in 2006 and told him he had some "swapped-out beer or traded-out beer in the warehouse" that he could purchase for a discount. (Halligan Depo. at 34-35.) Halligan believed that this discounted beer was also coming from Orrison and would sometimes purchase it if he needed it at the time, but not always. *Id.* at 77-80.

Similarly, Kirchhefer approached the owner of the Commodore Bar, Rick Bowen and told him the same story about breakage and obtaining a special price. (Kirchhefer Depo. at 56.) Bowen testified that Kirchhefer approached him about buying close to date beer at a discount sometime in 2006. (Bowen Depo. at 79-82, 85). As with Halligan, Bowen testified that he was not aware that the beer Kirchhefer was selling him at a discount was stolen. *Id.* at 90-91, 160).

Kirchhefer did not tell either Halligan or Bowen that the beer he was selling them was stolen. (Kirchhefer Depo. at 191-92, 222-24). Both Bowen and Halligan deny they

ever were aware that the "discounted" beer Kirchhefer was selling them was stolen. (Halligan Depo. at 80-81; Bowen Depo. at 160.)  On a weekly basis Kirchhefer would then conduct presales at these bars and electronically send in the beer order, via handheld computer, to Orrison for delivery the next day. *Id* at 51-52.  It was at the time of these presales Kirchhefer would offer to sell Halligan and/or Bowen the discounted beer, kept in his Orrison van, preferably for cash, so he could pocket the money. *Id.* at 53, 56-57. Both Halligan and Bowen were "interviewed" by Plaintiffs' counsel's investigator, Kevin Hughes, just prior to being served with the summons and complaint in this case, and stated they were unaware that the beer sold by Kirchhefer was stolen. (See Hughes Depo. at 16, attached as Exhibit 7 to Defendant Halligan's Motion for Summary Judgment). There is no direct evidence in the record to establish, outside of an inference, that either Bowen or Halligan were aware or knew that the beer they were purchasing from Kirchhefer was stolen.

Kirchhefer's thefts from J & B were eventually caught on tape in late 2007 and early 2008.  Prior to this time the owners/operators of J & B discovered that they were not making any money on beer sales.  Even prior to his death in November of 2004, Mr. Kroenlein, the predecessor in interest and operator of J & B Liquors had mentioned on a couple of occasions to his daughter, Deborah Alden, that he was not making anything on beer, that there must be something wrong. (See Deborah Alden Depo. at 8-9).  He also indicated a need to speak to Eric Alden[4], Deborah's husband and his attorney, about

---

[4] Mr. Eric Alden and Deborah Alden each own an interest in Chugwater Brewing Company. (Deborah Alden Depo. at 14).

loosing money on beer sales. *Id.* at 12.   Upon the November 2004 death of Mr. Kroenlein, his son-in-law and attorney, Eric Alden, began overseeing the operation of J & B liquors. (Eric Alden Depo. at 8, 40; Deborah Alden Depo. at 36-37).

In January 2007, Mr. Alden moved from Wheatland, Wyoming to Torrington, Wyoming and took over the daily operation of J & B Liquors. (Deborah Alden Depo. at 36-37; Eric Alden Depo. at 8).   However, even prior to 2007, Mr. Alden had begun reviewing the books for J & B Liquors. (See Depo. of Carol Clark at 11-15.)  Ms. Clark testified that Mr. Alden would drop in every couple of weeks and would review sales summaries. *Id.* at 10-11.  In addition Ms. Clark would also prepare monthly profit and loss statements for J & B Liquors, which were broken down by products and expenses and reviewed with Mr. Alden on a frequent basis. *Id.* at 12-14.  Ms. Clark testified that she pointed out the loss on beer sales to Mr. Alden "earlier in the year that Bob [Robert Kroenlein] died, it would be earlier in that year." *Id.* at 15.[5]  In her initial 2004 discussion with Mr. Alden, Ms. Clark testified that he was aware Robert Kroenlein had been looking into it and Alden "was going to do some more research and look at invoices and pricing and everything he could think of." *Id.* 16.

---

[5] Counsel erroneously believed that Mr. Robert Kroenlein had died in 2006, when he actually passed away in November 29, 2004. During the deposition of Deborah Alden the year of Mr. Kroenlein's death became a point of contention between Plaintiffs' Counsel and counsel for Mr. Bowen.  Both counsels' conduct was unprofessional, unnecessary and reflects poorly on them and the practice of law in general.  The Court would also note that there are a number of times throughout the depositions in this case that Plaintiffs' counsel made inappropriate speaking objections coaching the witness, was unnecessarily rude, argumentative and obstreperous with the deponent and/or opposing counsel.  This is not the first case in which this Court has observed Plaintiffs' counsel engaging in such conduct. It will stop.  Plaintiffs' counsel is an incredibly bright, experienced and talented lawyer who should be above such conduct.

Eric Alden testified that, as referenced in ¶ 21 of Plaintiffs' Complaint, he began noticing discrepancies in the beer purchases and sales, specifically the income from beer sales was less than J & B's expense for beer:

Q.  Okay.  And what I want to know, in – when was it in 2007 that you realized that there were some discrepancies in the accounting?  That's what is set forth in paragraph 21 in terms of a date, indicating here in early 2007, but can you give a better estimate of when that might have been?

A.  My guesstimate would be around – probably around March, because that would have been when like tax stuff would have been then prepared.
Q.  So you think that in March of – it's your testimony that in March of 2007 is when you began to notice these discrepancies.

A.  I really think that before that time I had sort of subliminally known that there was something wrong with the numbers on beer sales and they didn't add up or look right, but in 2007, I began to take a hard look at it.

Q.  What do you mean by subliminally know?  Just by looking at the tax returns?  I need to understand what you mean by that.

A.  By looking at the tax returns and perhaps by looking at some sort of like a monthly summary or something from the accountant.

Q.  And so I understand it, then, by let's say the 1st of March in 2007 is when you clearly noticed these discrepancies?  Is that my understanding?  [Objection by Plaintiffs' Counsel]

A.  That's when I started seriously looking into the cause of the discrepancy.

Q.  That's when you began to seriously looking into the cause of the discrepancy was in March of 2007.

A.  Right.

Q.  Okay.  There was another question in my mind, though, is when did you note that there was a mathematical discrepancy, something greater than a hunch or a subliminal notion?

A.  It must have been earlier than that, but I couldn't put a date on it.

(Eric Alden Depo. at 40-42.)  Mr. Alden testified, consistent with Ms. Clark, that it was

his review of the accounting reports that gave rise to his concerns.

> Q.  What caused you to have the suspicion prior to March of 2007 that there were discrepancies that you began to investigate in March of 2007?

> A.  Well, the accounting would come through and there were occasions, frequent occasions, where the amount of money that we were making from the sale of beer was actually smaller than the amount of money we were spending on the purchase of beer.

> Q.  And that seems like a pretty significant discrepancy.

> A.  It is.

> Q.  And that occurred sometime prior to March of 2007?  Can you give a better – like month, for instance, when that may have – you may have noticed that?

> A.  No.  It would have been in 2005 or 2006 even, but it would be hard to pin down. . . . ..

> Q.  So this is something that you first became aware of as early as 2005.

> A.  I believe so, yes.  I believe that in 2005, there was an awareness that there was a problem there.

> Q.  And that awareness is based on you reviewing the what appear to be discrepancies between the beer invoices coming from Orrison and the sales of beer from J & B?

> A.  Right.  It wasn't just Orrison, because everything was lumped together as beer sales, beer purchases.

> Q.  When, roughly, in 2005 would you think that you first noticed this, these discrepancies?
> [Objection by counsel].
> A.  I would guess that it would have been.
> [Objection by counsel].
> A.  Yeah, I really don't know.

Q.  Well, we can do better than that.  I mean, you think and you just testified that you believe that you noticed these discrepancies as early as 2005, correct?

A.  Yes.

Q.  Okay.  Give me an indication of what quarter in 2005 you believe that you would have noticed these discrepancies.
[Objection by counsel].

A.  By the fall of 2005, I was aware of the fact that the problem was not easily explained just by seasonal discrepancies.

**Q.  Okay.  So by the fall of 2005 – and let's just put it at the last quarter of 2005.  Is that fair?**

**A.  Sure.**

**Q.  You became aware and noticed that there were discrepancies between the statements, the invoices of Orrison, and the beer sales from J & B; is that right?**
**[Objection by counsel]**

**A.  Right.**

**Q.  So there had to have been some other significant problem with the beer that J & B was receiving and selling from Orrison, Right?**
**[Objection by counsel]**

**A.  Yes, but I'm not sure I was aware of how significant at that time.**

**Q.  But definitely aware of a discrepancy.**

**A.  Right.**

(See Eric Alden Depo. at 43-47).  On August 30, 2007 Mr. Alden made an inventory of the beer at J & B Liquors, on the day prior to Orrison's beer delivery. *Id*. at 17, Plaintiffs' Complaint at ¶¶'s 22-26.  He then conducted an inventory after the delivery and compared it to the invoice for product received, revealing a significant shortage. *Id*.  Mr.

Alden continued making pre and post delivery inventories of products delivered by Orrison, which continued to show significant shortages, from the amount invoiced. He also installed a surveillance camera from which he was able to observe Kirchhefer's thefts of product invoiced, but not delivered from Orrison. *Id*. at 24; see also Complaint at ¶¶s 29-134.

Following his observation of Kirchhefer's thefts Alden then turned the matter over to the authorities. In 2008, Plaintiffs' drafted a complaint and threatened suit against Orrison for the theft of beer by its employee, Kirchhefer. (See Halligan's Motion for Summary Judgment, Exhibit 4; see also Higgins Depo. at 62.) Ultimately, Orrison paid Plaintiffs' $175,000 for the theft of beer by Kirchhefer. (Higgins Depo. at 29.) It is behind this factual backdrop that Defendants' motions are analyzed.

## SUMMARY OF CLAIMS

Plaintiffs Robert L. Kroenlein Trust and Chugwater Brewing Company, Inc. (collectively hereinafter "Kroenlein") have brought suit against Defendants Gary Bruce Kirchhefer ("Kirchhefer"), Commodore Bar, Inc., Rick L. Bowen, Silver Dollar Bar of Lusk, LLC, and Larry R. Halligan, asserting eight causes of action: (1) a title 18 U.S.C. § 1962(a) civil Racketeer Influenced and Corrupt Organization Act claim (hereinafter "RICO" claim) against Kirchhefer, the Commodore Bar and Rick Bowen; (2) a § 1962(a) civil RICO claim against Kirchhefer, the Silver Dollar Bar and Larry Halligan; (3) a § 1962(c) civil RICO claim against Kirchhefer, the Commodore Bar and Rick Bowen; (4) a § 1962(c) civil RICO claim against Kirchhefer, the Silver Dollar Bar and Larry Halligan;

(5) a § 1962(d) civil RICO claim against Kirchhefer and Rick Bowen; (6) a § 1962(d) civil RICO claim against Kirchhefer and Larry Halligan; (7) a state law claim for the "intentional tort of conversion" against Kirchhefer, Commodore Bar, Inc., Rick Bowen, Silver Dollar Bar of Lusk, LLC and Larry Halligan; and (8) a state law claim of fraud against Kirchhefer.   Plaintiff seeks damages in the amount of at least $337,326 plus punitive and treble damages and attorney fees under 18 U.S.C. § 1964(c).

## DISCUSSION

Among other grounds, Defendants have sought summary judgment on the basis that the undisputed facts establish that Plaintiffs' RICO claims are barred by the applicable statute of limitations.   In addition Defendants assert that the undisputed facts fail to show that Defendants functioned as a RICO "enterprise" or that they "participated in the conduct of the enterprise's affairs." *See United States v. Turkette*, 452 U.S. 576, 583 (1981) and *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).   Plaintiffs' contend that their claims are timely and, despite the exercise of due diligence, they could not have discovered the RICO injury until August 31, 2007.   Thus, having filed their complaint on August 15, 2011, Plaintiffs assert it is timely.   Plaintiffs assert that sufficient evidence exists to support the existence of a RICO enterprise that had a significant effect on interstate commerce.   As detailed below, the Court finds that the undisputed facts establish that Plaintiffs' RICO claims are barred by the four-year statute of limitations and as a matter of law Defendants' are entitled to summary judgment on Plaintiffs' RICO claims (Counts I through VI).   As to Plaintiffs' remaining state law claims of conversion

and fraud, this Court declines to exercise jurisdiction over them and will dismiss them without prejudice.[6]

In order to sustain a civil claim under RICO a plaintiff must establish that he was injured by a RICO violation. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The elements of a RICO violation, whether under § 1962(a), (c) or (d) require: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Dummar v. Lummis*, 543 F.3d 614, 620-21 (10th Cir. 2008). This "pattern of racketeering activity" requires at least two acts of racketeering activity. See 18 U.S.C. § 1961(5). What constitutes "racketeering activity" is identified under the RICO statute, 18 U.S.C. § 1961(1).

The Supreme Court has determined that civil federal RICO claims are subject to a four-year statute of limitations period. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987). However, the Supreme Court has yet to definitively determine whether this four year statute begins running: (1) when the plaintiff knew or should have known of his injury (the injury-discovery rule); or (2) when the plaintiff was injured, whether aware of the injury or not (the injury-occurrence rule). *See Dummar,* at 621, citing *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1234 (10th Cir. 2006). Whether under the injury-discovery or harsher injury-occurrence rule, **a plaintiff's awareness of the pattern of racketeering activity is not required to trigger**

---

[6] Pursuant to 28 U.S.C. § 1367(c), this court may decline to exercise supplemental jurisdiction over a state-law claim for a number of reasons, including if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Smith v. City of Enid ex rel. Enid City Comm'n,* 149 F.3d 1151, 1156 (10th Cir.1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.")

**the running of the statute of limitations**. 543 F.3d at 621, citing *Rotella v. Wood*, 528 U.S. 549, 553-54 (2000) ("discovery of the injury, not discovery of the elements of a claim is what starts the clock"). In *Rotella v. Wood*, 528 U.S. 549 (2000), the Supreme Court noted that equitable principles of tolling may be applicable to RICO claims where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it. *Id.* at 561. Following this comment the Tenth Circuit held in *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008), that a RICO cause of action can be tolled by fraudulent concealment when the plaintiff establishes (1) use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; (3) the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action. *Id.* at 621; citing with approval *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994). An allegation of fraudulent concealment must be pled with particularity. *Id.*

In this case, assuming the first two elements have been satisfied, the undisputed evidence fails to support that by the exercise of due diligence Plaintiff could not have known a cause of action may have existed. As detailed above, in the fall of 2005, Mr. Alden testified that he was aware of the discrepancies between the invoices of Orrison and the beers sales from J & B Liquors. There is no evidence to suggest or support why, upon learning of these significant discrepancies it was not until August of 2007 that an inventory was taken, revealing that the invoice Kirchhefer was submitting was for more beer than he actually delivered. The "scheme" was neither complex nor hidden from a simple accounting/inventory. There is no evidence to support or even suggest that an

inventory prior to August of 2007 was not possible or that some other explanation for the many years and months after months that J & B Liquor's cost of beer purchased exceeded beer sales.   Simply put, there is no facts or information which Plaintiffs discovered between the Fall of 2005, when Mr. Alden became aware that beer purchases were exceeding beer sales and August 2007, when he undertook to discover the cause of this problem.  There is no reason or facts before this Court to show why what was discovered in the fall of 2007 was not discoverable in the fall of 2005.  Neither are there any facts to suggest something more was "revealed" to enable discovery of Kirchhefer's theft of beer -- injury.

Plaintiffs assert that it was only upon Kirchhefer's arrest and subsequent interview that they learned of Bowen and Halligan's "involvement" and scheme.   However, as noted in *Dummar v. Lummis*, 543 F.3d at 621, a plaintiff need not be aware of the pattern of racketeering activity before the statute of limitations begins to run.   Moreover, Plaintiffs' argument was expressly, if not implicitly rejected in *Rotella v. Wood*, 528 U.S. 549 (2000) (discovery of injury caused to the business triggers start of statute of limitations not discovery of other elements of claim—such as pattern of RICO activity). The undisputed facts establish that in the Fall of 2005 Plaintiffs were aware of the injury to their business and, had they then exercised due diligence, they would have known of their cause of action.  Accordingly, having failed to bring their RICO claims until August 15, 2011, they are barred by the four-year statute of limitations.

Aside from the statute of limitations problem, which is dispositive as to all of Plaintiffs' RICO claims, the court notes that the undisputed facts would also appear to

fail to establish the existence of a racketeering enterprise. To support a civil claim based upon enterprise liability, a plaintiff is required to establish (1) "an ongoing organization with a decision-making framework or mechanism for controlling the group," (2) "that various associates function as a continuing unit," and (3) "that the enterprise exists separate and apart from the pattern of racketeering activity." *U.S. v. Smith,* 413 F.3d 1253, 1266-1267 (10th Cir.2005). A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" and requires evidence "of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Seidl v. Greentree Mortg. Co.,* 30 F.Supp.2d 1292, 1305 (D.Colo.1998) (quoting *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524.)

In this case the undisputed evidence fails to establish any ongoing organization between these defendants. Whether Bowen and Halligan suspected or reasonably believed that Kirchhefer was taking or stealing beer from someone, there is no evidence to indicate they coordinated the activity or there was an ongoing enterprise between Kirchhefer, Bowen and Halligan. *See Albright v. Attorney's Title Ins. Fund,* 504 F.Supp.2d 1187 (D.Utah 2007) (fact that title insurance benefited from the fraudulent affairs of wrongdoer and provided a service used by wrongdoer did not establish title insurance company was involved in the operation and management of the enterprise that committed fraud resulting in plaintiff's injuries); *see also BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.,* 194 F.3d 1089, 1101-02 (10th Cir. 1999) (title companies did

nothing more than provide their regular closing related services and no evidence existed to support that title companies directed the activities of or participated in the management of the alleged RICO enterprise). It was Kirchhefer alone that caused fraudulent invoices to be transmitted in interstate commerce and submitted to J & B, including beer that Kirchhefer had stolen for his own use and distribution. Neither Halligan nor Bowen did anything to enable this fraudulent activity to occur.

At best the evidence in this case establishes that Defendants Halligan and Bowen had reason to believe Kirchhefer was selling beer stolen from his employer. However, there is no evidence to even create a genuine issue of material fact supporting that Bowen and/or Halligan directed or controlled Kirchhefer's actions or the operation of his theft or this enterprise. Based upon a review of the case law simply purchasing and reselling a product that may have been stolen, without more, does not appear sufficient to support a RICO claim under the case law. Accordingly, even if Plaintiffs' RICO claims were not barred by the four-year statute of limitations, they would still fail.

## CONCLUSION

The undisputed facts establish that Plaintiffs have failed to timely pursue their RICO claims within the applicable four-year statute of limitations. Accordingly, as a matter of law Defendants are entitled to a judgment in their favor on Plaintiffs' RICO claims, counts one through six and Defendants' Motions for Summary Judgment are granted as to these claims. As to Plaintiffs' remaining state law claims of conversion and fraud, this court will dismiss them without prejudice. Each party shall bear their own costs and fees associated with these proceedings. Therefore, it is hereby

ORDERED that Defendants Motions for Summary Judgment [Doc 76, 80 and 89] are hereby GRANTED as to claims one through six of Plaintiffs' Complaint.  It is further

ORDERED that Plaintiffs' state law causes of action, set forth in claims seven and eight of Plaintiffs' Complaint, are hereby DISMISSED without prejudice.

Dated this _31st_ day of March 2013.

Scott W. Skavdahl
United States District Judge